AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Maryland

JAN 03 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| United States of America<br>v.<br>WESLEY BURNETT<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. **14-0027TJS** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  July 1, 2009 to December 24, 2013  in the county of  Montgomery  in the
_____ District of  Maryland , the defendant(s) violated:

*Code Section*                          *Offense Description*
18 U.S.C. Sec. 1343                     wire fraud

This criminal complaint is based on these facts:
see attached affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*
Special Agent Jason Powers
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 3, 2014

_____
*Judge's signature*
Timothy J. Sullivan
~~Stephanie A. Gallagher~~, U.S. Magistrate Judge
*Printed name and title*

City and state:          Baltimore, Maryland

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

Your affiant, Jason Powers, being duly sworn and deposed, states as follows:

**I.   INTRODUCTION**

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2. I am a Special Agent with The U.S. Small Business Administration, Office of Inspector General (SBA-OIG). I am assigned to the Washington Field Office for SBA-OIG. During my tenure with SBA-OIG, I have been assigned to investigate a variety of white-collar offenses, to include: business loan fraud, procurement fraud, bank fraud, wire fraud, and mail fraud. I have personally prepared and participated in the execution of search and arrest warrants involving violations of federal criminal laws. During the execution of these warrants, I have recovered and participated in the recovery of items of evidence which were later utilized in the successful prosecution of criminal offenses.

3. I am presently participating in the investigation of Yogesh K. Patel, of United Native Technologies, Inc. (UNTI), and **WESLEY BURNETT**, of Confederate Group LLC (CG) and Total Barrier Works (TBW).

4. The statements in this affidavit are based on my personal knowledge and information obtained from SBA-OIG, the U.S. Department of the Interior, Office of Inspector General (DOI-OIG) and the U.S. Air Force, Office of Special Investigations (AFOSI), and from using numerous investigative techniques, as well as information received from persons with knowledge regarding relevant facts, and from our review of records and documents.

1

5. This affidavit is made in support of a criminal complaint charging **WESLEY BURNETT** with knowingly and willfully executing and attempting to execute a scheme and artifice to defraud the United States and to obtain money from the United States by means of material false and fraudulent pretenses and representations or promises by transmitting or causing to transmit by means of wire communications in interstate commerce an email on January 17, 2012, in violation of 18 U.S.C. § 1343 (wire fraud).[1]

## II. BACKGROUND

6. On June 12, 2013, United States Magistrate Judge Timothy J. Sullivan authorized the search and seizure of email accounts associated with Patel and **BURNETT**.

7. On November 25, 2013, United States Magistrate Judge Timothy J. Sullivan signed a criminal complaint charging Yogesh K. Patel with wire fraud, in violation of 18 U.S.C. § 1343.

8. Patel was arrested on November 26, 2013, on this charge and appeared before United States Magistrate Judge Charles Day for an initial appearance.

---

[1] The full text of 18 U.S.C. § 1343 is as follows:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

### III. PROBABLE CAUSE

9. The National Park Service (NPS) is a U.S. federal agency administered by the U.S. Department of the Interior (DOI). NPS manages all national parks, many national monuments, and other conservation and historical properties.

10. Congress has provided the NPS with authority to enter into various types of agreements with other federal bureaus; with state, county, and municipal governments; and with private companies, corporations, groups, and individuals.

11. According to the SBA's website, the "[t]he 8(a) Business Development Program is a business assistance program for small disadvantaged businesses. The 8(a) Program offers a broad scope of assistance to firms that are owned and controlled at least 51 percent by socially and economically disadvantaged individuals." Participants in the 8(a) program can receive sole source contracts that are reserved for companies in the 8(a) program. These contracts are often referred to as "set aside" contracts.

12. Based on my training and experience I know that a common type of procurement fraud involves a company, that may or may not be a disadvantaged business, using a legitimately disadvantaged business as a "shell" or "front" company for the purpose of obtaining government set aside contracts. The company then performs the majority of the work and retains the majority of the profits. This scheme generally involves multiple false statements and/or claims to the federal government.

13. On July 8, 2009, the NPS awarded a purchase order contract in the amount of $63,040.00 to Confederate Group LLC, (DUNS# 626910728), DBA Total Barrier Works (TBW), 60 E Simpson Ave., Jackson WY, 83001, for the repair and maintenance of the security barricade system at the Boston National Historical Park, Charlestown, MA. Between July 7, 2009, and

3

July 2013, this contract has been modified on two occasions bringing the total contract value to $130,376.53.

14. The U.S. Department of the Interior, Office of Inspector General (DOI-OIG) conducts, supervises, and coordinates investigations that scrutinize allegations involving contractors, grantees, or other entities doing business with and receiving funds from DOI.

15. On December 5, 2011, the DOI-OIG opened an investigation into allegations made by a former employee (hereafter "Employee 1") of TBW. Employee 1 worked for TBW from May 25, 2010 to July 22, 2011. Subsequently, the SBA-OIG joined the investigation because the allegations included fraud related to the 8(a) program administered by the SBA.

16. Employee 1 told investigators that during the period when he worked for TBW, **BURNETT**, the owner and president of TBW, posted, or directed Employee 1 to post, advertisements on Craig's List seeking service disabled veterans and socially and economically disadvantaged individuals that were eligible to apply to participate in the SBA 8(a) program. Craig's List is a website where individuals and businesses can post items for sale, job openings and other business opportunities.

17. Employee 1 alleged that once a company located through Craig's List was certified under the 8(a) program, **BURNETT** used that company to bid on federal contracts that are reserved for companies in the 8(a) program in exchange for paying the individual between 4-5 percent of the contract value. According to Employee 1, all of the work was done by TBW. TBW was not an 8(a) company and therefore was ineligible to apply for sole source and other 8(a) set-aside contracts.

18. Based on activities that Employee 1 witnessed and was a party to during his employment with TBW, he believes that **BURNETT** may have this type of arrangement with the owners of several companies to include UNTI.

19. UNTI is an 8(a) certified business owned by Patel. The SBA certified UNTI as an 8(a) company as of November 29, 2005. The company is scheduled to "graduate" from the 8(a) program on November 29, 2014.

20. A review of government contracting databases shows that between October 2010 and July 2013, UNTI has been awarded $2,268,393.10 in U.S. Government contracts.

21. A review of e-mail messages obtained during the course of this investigation support the assertion that **BURNETT** uses Patel and UNTI as a pass-thru to obtain 8(a) set aside contracts in exchange for 5 percent of the set-aside contracts value.

22. The email exchanges and the recorded telephone call summarized below occurred during a period when Patel lived and worked in Maryland and **BURNETT** lived and worked in California.

23. In an e-mail from Patel to **BURNETT**, dated December 21, 2009, Patel wrote, "Also I talked to the people and Dunn & Bradstreet today and they will update the CCR record within 2 business days to reflect that UNTI is doing business as Total Barrier Works..." The investigation has not uncovered any evidence that TBW was another name for UNTI. To the contrary, both were distinct businesses, UNTI owned and controlled by Patel and TBW owned and controlled by **BURNETT**.

24. In a series of e-mails between Patel and **BURNETT** dated April 19, 2011, with a subject line that reads: "IMPORTANT: new SBA Rules on Submission of Financial Statements and Tax Returns" Patel stated "P.S. I told you there is a lot of compliance work for me (to earn my 5%)."

5

25. In an series of e-mails between Employee 1, **BURNETT** and Patel between May 5, 2011 and May 10, 2011, Employee 1 stated that $36,900 from a contract at "Andrews" [Andrews Air Force Base] was deposited into WF 3340 [Wells Fargo account ending in 3340, in the name **BURNETT** and Confederate Group]. Employee 1 asked "What is the percentage you agreed to pay Yogi for this contract? This information is needed to set up a payable for the 5/13/2011 pay date." Patel responded to this e-mail by providing UNTI's checking account number ending in 7319, routing number 055003201, at Wachovia Bank, and stated "Please let me know if you need anything else or if something changes in regards to the Friday direct deposit."

26. In a series of e-mails between Patel, and **BURNETT** dated between June 21, 2011 and June 23, 2011:

    a. **BURNETT** asked Patel to prepare a "Cap statement" [capabilities statement] for a contract at Andrews AFB;

    b. Patel responded stating "…please let me know if they are considering this opportunity as an 8(a) and the additional value/$ to you for this marketing effort (can be realized only if awarded the work)? So basically, what's in it for me in addition to **passing it through UNTI**…" (emphasis added);

    c. Patel further responded by asking **BURNETT** "…how do u want to work the compensation for the additional work beyond a **pass through of the 8(a)**?" (emphasis added);

    d. **BURNETT** responded stating "If we get this job you will make money for the next five years from doing a couple hours of work….there's probably will not be much more you ever have to do other than the filing's 8(a);"

    e. Patel responded stating "the only problem/rub is with all the work I've done previously with you over the past 4 years; I've only made about $2,000;"

    f. **BURNETT** responded stating that "I am not aware of 'all the work I've done previously with you over the past 4 years; I've only made about $2,000.'" Perhaps my memory is really bad but I do not know what work you are referring to? And when Andrew

6

AFB is finished from my experience of service calls and existing contract amount you will get well over 22,500.00 and never have to lift another finger;"

g. Patel responded citing work he had not been compensated for with regard to assisting **BURNETT** on proposals and letters. Patel went on to say "Sorry, I just didn't want to continue to do additional work beyond the **pass through work** without acknowledgement and compensation....Finally I feel disrespected when you continue to think there isn't much work involved in **passing contracts through UNTI**. Maybe you forget the countless hours spent with Liam, and the future hours that will be spent in aggregating your contracts with mine, keeping a proper 8(a), non-8(a) and commercial work; all to be reported in detail to SBA annually." (emphasis added); and

h. **BURNETT** responded stating "If anything these project [sic] you are profiting on make it worthwhile, and also may help you continue your 8(a) recognition.... The statements look very nice and maybe too much, **I hope they don't ask for backup!**" (emphasis added).

27. In a series of e-mails between Patel, Employee 1, and **BURNETT** dated between May 14, 2011 and September 7, 2011:

a. Patel requested confirmation that there was an error made in calculating the 4.5% of a $44,515.50 payment received from Andrews AFB. Patel requested that "you will make up the additional difference of $228.16 and add it onto the next cycle's payment. Can you please confirm this and when the next payment cycle is expected?"; and

b. Patel forwarded the above referenced e-mail to **BURNETT** on September 7, 2011, stating "... please send me access to view the bank account on-line; I can start to monitor and set up my cash flow verifications and balance statements and how I'm going to represent everything for SBA and later to be verified with what your accountant sends me."

28. In an e-mail from Patel, to D.F. with a "cc" to **BURNETT**, dated September 28, 2011, Patel requested verification of the 4.5% he should be receiving from a payment that was received for work on the Andrew's contract. Patel further stated "Please forward UNTI Banking access

(set up by TBW) for me to begin tracking and balancing cash flow in preparation for the upcoming SBA 8(a) annual review and audit."

29. In an e-mail from Patel to **BURNETT** dated November 3, 2011, Patel stated:

> "I thought you said you were almost finished with 2009 and 2010 taxes?
>
> I can't express the urgency of this matter.
>
> When are you going to give me access to the UNTI Bank Account? Are you having your other existing contracts pay to the UNTI account as we agreed to? If we don't have at least 50% of our non-8(a) revenues hit the UNTI account; I will lose my 8(a) certification and face **fraud and penalty charges** based on how this was done (since you have yet to show me the account or give me access)." (emphasis added)

30. On January 16, 2012 Patel emailed **BURNETT**, "...please let me know how you plan to merge and legally show previous and future business with UNTI (including how you plan to do the 2011 taxes and in providing me with the 2010 return). Then please let me know what percentage you are willing to pay on this particular effort (since we initially worked together in building this business from me researching and drafting the initial capabilities). I believe Andrews may want to do this as an 8(a) set-aside or are particularly targeting us and therefore we may be able to price in the additional compensation."

31. On January 17, 2012, **BURNETT** responded to Patel stating "At this time you are receiving 4.5% of the total job, which means you get 4.5% of repair parts that TBW buys and can't mark up, material, insurance, payroll, overhead etc., and all other hard money expenses that TBW has that you actually get 4.5% of."

32. In an e-mail message from **BURNETT** to R.E., dated January 18, 2012, **BURNETT** stated:

"I have found myself in a situation I need immediate help with, Confederate Group LLC started doing 8(a) contracts under a company called United Native Technologies Inc. dba Total Barrier Works. These contracts are my contracts that I received through my efforts and contacts, UNTI (Yogesh Patel) had nothing to do with them. I met Yogesh Patel in Costa Rica on Vacation and he had a 8(a) company he was doing nothing with. He told me I could try to get projects under his 8(a) and we made a deal for me to give him 4.5% of [sic] the top of every payment I received. I since gave him view only access to my Wells Fargo account so he could monitor the money we received toward these 8(a) contract.

Since starting this agreement I have received 4-8(a) contracts for Andrews AFB, GSA Potomac Center, Newport RI Navel Center and Nellis AFB. These contracts add up to about $284,615.00 per year for the next 5 years. Since this took place Yogesh Patel went into CCR and changed the banking to route WAWF payments directly into his account. He notified us a few weeks ago that he did this and received a payment from Andrews AFB for about 6K. Since then there has been billing and he should have received or will be receiving very soon another 91,486.66 of my money in his account. This is Confederate Group Money and he has expended not one dime toward this nor any effort. At this time I trust Yoge (Yogesh Patel) to do the right and honest thing. But only 4.5% of this money is rightfully his, money.

Now he wants to know how we are handling this agreement. There are a few factors relating to this, one being UNTI has to do 50% non 8(a) work to match the 8(a) work received. Since he does no work at all I need to merge some of my contracts into his company. Also taxes, Yoge want to know how we handle taxes. So do we need to somehow merge, say the UNTI purchased Confederate Group LLC or what. He probably will not relieve [sic?] my funds until this is agreed and in writing. Also another important factor is Confederate Group just received a very large nationwide (50 states, or 57 according to Obama) with Corp of Engineers, and are about to be awarded another worldwide contract with the Navy. So a merger is questionable."

33. On February 8, 2012, R.E. responded stating "Your email below is very troublesome in that it subjects the current Members (owners) of The Confederate Group, LLC to extreme financial and legal liability. The members cannot and will not assume the extreme financial and

9

legal liability." R.E. attached documents formally withdrawing their representation and membership from several companies to include The Confederate Group LLC.

34. **BURNETT** responded stating that the letter he wrote "created some misunderstandings." **BURNETT** stated that "I have four projects that I am running under his [Patel's] company (UNTI) that were received because of 8(a). He has control over his company and therefore can change bank account information in the CCR (Contractor Registry) which he directed to pay to UNTI to follow 8(a) correct procedure. All projects are billed and paid directly to bank account on record under WAWF (Wide Area Work Flow) system. This directed all payments to United Native Technology bank account instead of Confederate Group. Patel offered to send CG LLC their 95.5% of funds and I told him no, not until we figure out how to do this correctly. Confederate Group is simply doing the work for UNTI under a subcontract and need to set it up correctly for taxes and 8(a) compliance along with PSE LLC format."

35. In a consensually recorded telephone call between **BURNETT** and Patel on December 19, 2013, **BURNETT** and Patel discussed money that Patel had collected on pass-thru contracts awarded to UNTI but where TBW was performing the services. During that call **BURNETT** told Patel, "It's not UNTI's money and you know it. Not a dollar of it is UNTI's money. I did everything. You did nothing." Prior to this call, Patel had told **BURNETT**, at the direction of the investigating agents, that he had spent the money he had received for these contracts and would not be providing any of it to **BURNETT**. Patel agreed to cooperate in the investigation after his arrest in November.

36. Later in that same telephone call, Patel told **BURNETT**, "we had some confusion on what the original arrangement was" and **BURNETT** responded by saying, "There was no confusion. It was ninety-five percent, four and-a-half percent. There was no confusion. The rest

of it, we fixed it. There was no confusion ever on the money part of it . . . Yeah, there was confusion because I didn't know about how the 8(a) program worked. I didn't know about the fifty-one percent, forty-nine percent where you had to do. I didn't know about that when we first started the program. I learned. I learned it, I fixed it."

37.     Your affiant believes that **BURNETT"s** statement about "fifty-one percent, forty-nine percent," is a reference to the requirement that an 8(a) business must perform at least 51 percent of the work on an 8(a) set-aside contract. Your affiant further believes that **BURNETT's** statement that he "fixed it" is a reference to the fact that the four contracts awarded to UNTI where TBW is doing the work are awarded to UNTI doing business as TBW, even though, in fact, the two companies are distinct entities.

38.     On December 20, 2013, **BURNETT** sent Patel the following email:

> YogeshPatel,
>
> I spoke with this person (below) this am regarding NAS RI and explained a separate entity is owed money. She ask some questions about 8(a) and 51% and I didn't get into this with her and stated I did not know that much information on the business and 8(a) aspect. She was clear that if there was something misrepresented Yogesh Patel could be due criminal prosecution. The fact of the matter is you know what can be done by me right now and I will not hesitate. I will be contacted soon by Pamela Waller and other sites will follow. So you can stick with you story of spending all my money or you can find a way to pay me. Your story of spending my money is irrelevant though because it does not matter. You have a legal obligation to pay TBW, I don't care where you get the money from.
>
> We can work something out but I will definitely need a substantial amount of what you owe TBW and a document stating what you are paying now and the installments you will make to catch up all the money owed to me, including dates and amounts to be paid. This will be a legal, binding agreement. If I agree to your proposal for paying TBW the money owed and I begin billing the UNTI sites again, I will not have any of the funds going direct into your account. The only way I would agree to this is if UNTI has an

online user name and password to that account that you cannot change. I believe this is possible as I have done this with Wells Fargo.

You are not going to spend my money that came out of my Line of Credit, my credit cards, my non 8(a) jobs and from me working for two years to finance UNTI jobs so you can, as you say," spend my money". I believe you are lying again anyway. You can get my money from your bank, your line of credit, take a loan on your house...I don't care how and do not even want to hear about it as you dug this hole yourself by being dishonest so it is of no concern to me. But you better figure a way to pay me or I will not stop until you go to prison, and trust me they love guys like you there! You have pushed me to my limits, don't mess with a man's money!

At this point, I can send a letter that can sway this thing one way or the other depending on what you do now. If you pay me, I will honor, as I always do, what I said and we can complete these projects and you will still make the money you were supposed to. If you pay me, I will also honor any past agreement for the future because I am a man of my word, and not dishonest.

Your greed and desire to have what does not rightfully belong to you can ruin your life (prison, I'm not playing) or do what is good and right and save yourself from what you are getting ready to do to yourself. You will not get away with this so I would suggest you pay me now before you really go down.

I can save your ass or bury it, YOUR CALL but I better hear something fast. (or spend more than what you owe me on attorneys, see (8(a) agreement you signed attached)

IV. **CONCLUSION**

39.   Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that **BURNETT** knowingly and willfully executed and attempted to execute a scheme and artifice to defraud NPS and the SBA and to obtain money from NPS by means of material false and fraudulent pretenses and representations or promises by transmitting

or causing to transmit by means of wire communications in interstate commerce an email on January 17, 2012, in violation of 18 U.S.C. § 1343 (wire fraud).

40. Your affiant, therefore, respectfully requests that the attached complaint and warrant be issued.

## V. REQUEST FOR SEALING

41. Because this investigation is continuing, disclosure of this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Accordingly, the undersigned requests that the Court issue an order that the criminal complaint and this affidavit be filed under seal until further order of this Court.

_____
SPECIAL AGENT JASON POWERS
United States Small Business Administration
Office of Inspector General

Subscribed and sworn to before me,
this 3rd day of January 2014

_____
TIMOTHY J. SULLIVAN
United States Magistrate Judge
District of Maryland

13